_____
                                              )
**TIMOTHY LEYSOCK,**                          )
                                              )
    **Relator,**          )
                                              )   **Civil Action No.**
    **v.**                 )   **12-11354-FDS**
                                              )
**FOREST LABORATORIES, INC., and**            )
**FOREST PHARMACEUTICALS, INC.,**             )
                                              )
    **Defendants.**         )
_____)

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION TO DISMISS

**SAYLOR, J.**

This is a claim of attorney misconduct, arising in a *qui tam* action alleging the submission of false claims to Medicare. The alleged false claims involve the off-label use of a pharmaceutical called Namenda, which is approved by the FDA for treatment of moderate to severe Alzheimer's disease. Relator Timothy Leysock alleges that defendants Forest Laboratories, Inc., and Forest Pharmaceuticals, Inc., illegally promoted the off-label use of Namenda to treat mild forms of the disease, and that false claims were submitted to Medicare as a result.

The present dispute arises out of the conduct of counsel for relator, the Milberg law firm, in investigating the case. As set forth below, Milberg attorneys engaged in an elaborate scheme of deceptive conduct in order to obtain information from physicians about their prescribing practices, and in some instances about their patients. In essence, Milberg retained a physician and medical researcher, Dr. Mark Godec, to conduct a survey of physicians concerning their

prescription of Namenda to Medicare patients. In order to obtain the cooperation of the physicians, Dr. Godec falsely represented that he was conducting a medical research study. Dr. Godec, at Milberg's direction, conducted two internet-based surveys as well as follow-up telephone interviews. Among other things, the physicians were induced to provide patient medical charts and other confidential medical information to Dr. Godec. Information derived from those surveys was then set out in the Second Amended Complaint in this action, and was relied on by the Court in denying defendant's motion to dismiss in 2014.

Defendants have now moved to dismiss the Second Amended Complaint as a sanction for alleged violations of attorney ethical rules. For the reasons stated below, that motion will be granted.

## I.      Background

### A.      Procedural Background

#### 1.      The Parties

Forest Laboratories, Inc., and its wholly owned subsidiary, Forest Pharmaceuticals, Inc., are pharmaceutical companies. (2d Am. Compl. ¶¶ 15, 16). (The two companies will be referred to as a single entity for the sake of convenience.) Forest produces and sells a drug called Namenda, which has been approved by the Food and Drug Administration ("FDA") to treat moderate to severe Alzheimer's disease. (*Id.* ¶ 1).

Timothy Leysock is a resident of Florida. (*Id.* ¶ 14). From August 1996 until May 2012, he was employed by Forest as a sales representative. (*Id.*). His sales territory covered the counties of Palm Beach, Indian River, Martin, St. Lucie, and Okeechobee in Florida. (*Id.*).

#### 2.      The Complaints

Leysock, as relator, filed the original complaint in this action under seal on July 24, 2012.

That complaint alleged that Forest was promoting the off-label use of two drugs—Savella and Bystolic—and paying physicians kickbacks for prescribing those drugs, all in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.* (Compl. ¶ 1-4, 12, 61). On October 2, 2012, Leysock amended the complaint to include more specific factual allegations concerning Forest's off-label promotion practices, and to add a reference to Namenda. (1st Am. Compl. ¶¶ 75-78).

On April 16, 2014, the United States declined to intervene. On April 30, 2014, the Court unsealed the case. The same day, Leysock filed a Second Amended Complaint. The Second Amended Complaint focused only on the off-label promotion of Namenda; it did not allege wrongdoing as to Savella or Bystolic. In addition to factual allegations concerning improper off-label promotion by Forest, it also alleged certain specific instances of physicians prescribing Namenda for off-label use to Medicare patients. (2d Am. Compl. ¶¶ 86-202).

In particular, the Second Amended Complaint detailed the practices of eight physicians who, allegedly, regularly prescribe Namenda for mild Alzheimer's disease in reliance on the off-label promotion by representatives of Forest. (*Id.* ¶¶ 89-156). Those eight physicians were identified by name and address. (*Id.*). The complaint also identified eight patients, one for each physician; although it did not identify the patients by name, it included detailed patient information, such as age, height, weight, dates of visits, diagnosis, treatment plan, and prescriptions. (*Id.*). It then identified 24 additional physicians, including their names and addresses, and what purported to be information about their Namenda prescribing practices. (*Id.* ¶¶ 157-202). Finally, it referred to "a nationwide survey" of physicians in which "approximately 60% stated they wrote off-label prescriptions of Namenda and did so in reliance on Forest's off-label promotion of the drug." (*Id.* ¶¶ 203-04).

### 3.      Defendants' Motion to Dismiss

On June 20, 2014, Forest moved to dismiss the Second Amended Complaint for failure to state a claim upon which relief can be granted.  That motion was granted as to relator's conspiracy claim, but otherwise denied.  In denying the motion as to the substantive FCA claims, the Court specifically relied on the complaint's detailed allegations concerning the practices of the eight physicians identified who prescribed Namenda for off-label use.  *See United States ex rel. Leysock v. Forest Lab., Inc.*, 55 F. Supp. 3d 210, 218-19 (D. Mass. 2014).  Among other things, the Court held that those detailed allegations were sufficient to satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b).  *Id.* at 219.

### 4.      Defendants' Motion to Compel

On February 8, 2016, Forest moved to compel the disclosure of information and documents underlying those factual allegations.  Forest had learned that those allegations were all derived from a survey conducted by Dr. Mark Godec, who had apparently been retained by relator's counsel as an investigator.  (Def. Mem. in Supp. of Mot. to Compel at 6).  Relator had, apparently, not mentioned Dr. Godec in his initial disclosures.  He had also refused to provide discovery related to Dr. Godec's study on the ground that it was protected by the attorney work-product doctrine.  (*Id.* at 6-7).  Forest requested leave to seek third-party discovery from Dr. Godec, and moved to compel the production of all information and documents underlying the factual allegations in the Second Amended Complaint.  (*Id.* at 2).

In opposing that motion, relator continued to contend that the factual investigation underpinning the Second Amended Complaint was protected by the attorney work-product doctrine.  Among other things, he stated that Dr. Godec

> was retained to assist counsel's investigation in anticipation of the filing of the SAC. . . .  Dr. Godec, at Relator's counsel's direction and under Relator's counsel's

4

> supervision, conducted interviews of some physicians to whom Defendants had
> marketed Namenda. During those interviews, Dr. Godec asked questions prepared
> by, and under the supervision of, Relator's counsel. Dr. Godec took notes based on
> the interviews and disclosed the contents of the interviews to Relator's counsel.

(Pl. Mem. in Opp. to Mot. to Compel at 3-4).

At the hearing on the motion to compel, relator agreed to produce the information and

documents relating to Dr. Godec's research, and Dr. Godec was ultimately deposed.

### 5. Defendants' Second Motion to Dismiss

On October 7, 2016, Forest moved to dismiss the Second Amended Complaint as a

sanction for unethical conduct of counsel, based on the information provided by relator and the

deposition of Dr. Godec.[1]

## B. Factual Background

Dr. Mark Godec is a physician licensed in Maryland and Virginia. (Godec Dep. at 317).

He is also a former researcher at the National Institutes of Health. (*Id*. at 312).

In September 2013, the Milberg law firm retained Dr. Godec to investigate Forest's off-

label marketing and sales of Namenda. (*Id*. at 16). The investigation was conducted under the

direction of attorneys at Milberg. (*Id.* at 44). The attorneys at Milberg, not Dr. Godec,

developed the objectives for the investigation. (*Id.* at 42-43, 81-82).[2] During the investigation,

Dr. Godec spoke to attorneys at Milberg on a daily basis. (*Id.* at 36).

Dr. Godec enlisted a company called Charter Oak Field Services to assist him in the

investigation. (*Id*. at 66). Charter Oak is a marketing research and consulting agency that

---

[1] On November 9, 2016, relator cross-moved to impose sanctions on Forest as a result of its alleged failure to disclose e-mails from the period 2008-2013, which are stored in a database called Source One.

[2] According to Dr. Godec, he did not know prior to April 2016 that the objective of his work was to develop information for litigation. (Godec Dep. at 17-19, 49-50).

conducts and facilitates market research in the healthcare industry. (*Id.*; Hancock Decl. ¶ 1). Among other things, Charter Oak has a proprietary database of physicians, which was a necessary and important component of the survey. (Hancock Decl. ¶ 1; *see* Godec Dep. at 66-67, 87).

Dr. Godec told Charter Oak that "we were interested in conducting a survey of physicians nationwide regarding Namenda." (Godec Dep. at 71). When speaking to representatives of Charter Oak, he referred to the work as a "study" or as "research." (*Id.* at 82, 83). He did not disclose to Charter Oak that he had been retained by a law firm. (Hancock Decl. ¶ 3; Godec Dep. at 71-72).[3] He did not disclose that the information he intended to collect was to be used in a lawsuit, rather than for medical research purposes. (Hancock Decl. ¶ 3).

Charter Oak helped create online surveys, solicit physician participation in those surveys, collect the survey results, and schedule follow-up telephone interviews with physicians. (Hancock Decl. ¶ 2; Godec Dep. at 66-67). Attorneys at Milberg, however, designed the surveys and prepared the first drafts. (Godec Dep. at 94-95). Although attorneys were intimately involved in designing the survey, no attorney ever communicated directly with anyone at Charter Oak. (*Id.* at 72-73, 81-82).

Charter Oak believed that Dr. Godec was conducting surveys to support his own clinical practice or medical research. (Hancock Decl. ¶ 3). It would not have agreed to facilitate the surveys had it known that the results would not be kept anonymous and aggregated, or would not be used for research purposes. (*Id.* ¶ 5). Likewise, it would not have done so if it had known Dr. Godec had been retained by a law firm and that the information he collected was to be used in a

_____

[3] Dr. Godec advised Charter Oak at various points that he was having conferences with his "associates" before making decisions as to the "study." (Godec Dep. at 78, 87-88). The "associates" were, in fact, attorneys at Milberg. (*Id.*).

lawsuit.  (*Id.* ¶ 6).

Charter Oak sent invitations to physicians soliciting their participation in the online surveys.  (Godec Dep. at 96; Hancock Decl. ¶ 4).  The invitations stated that the survey was a "market research dementia study" and asked physicians to complete "a brief survey regarding Dementia and your treatment practices."  (Def. Ex. 13, 14; Hancock Decl. ¶ 4).  The invitation stated:  "As always, we value your privacy.  All responses will be anonymous and aggregated.  The data collected will only be used for research purposes."  (Def. Exs. 13, 14).[4]  Dr. Godec approved the invitation before it was sent out.  (Hancock Decl. ¶ 4).

At Milberg's direction, Dr. Godec conducted the first online survey in October and November 2013.  (Godec Dep. at 33).  Milberg attorneys decided how the survey was going to be conducted and helped draft the survey questions.  (*Id.* at 94-95, 173).

The first survey asked physicians generally about their off-label use of Namenda, as well Forest's promotion of such uses.  (*Id.* at 173).  Every physician who completed the survey and agreed to participate was paid an "honorarium" of $35.  (*Id.* at 113-14).

Dr. Godec provided the results of the online surveys to attorneys at Milberg.  (*Id.* at 45-46).  He followed up with telephone interviews of the 40 physicians who completed the first survey and who indicated a willingness to be interviewed.  (*Id.* at 105-06, 118-21, 285-86).  He worked from a script that he had prepared and that had been approved by attorneys at Milberg.  (*Id.* at 97-98, 124-25; Def. Ex. 15).  Charter Oak contacted the physicians to set up the interviews.  (Godec Dep. at 99-100).  In the interviews, Dr. Godec referred to the survey as a "Charter Oak" survey.  (*Id*. at 102-03, 122).

---

[4] The language in the invitation concerning physician and patient privacy was in keeping with the usual practice of Charter Oak.  (Hancock Decl. ¶ 4).

During the telephone interviews, Dr. Godec told the physicians that "we are studying drugs to treat patients with dementia." (*Id.* at 138-39).[5] Among other things, he asked the physicians whether they had used Namenda to treat patients with mild Alzheimer's disease, and, if so, whether they relied on information received from Forest, or one of its representatives, when they did so. (*Id.* at 141, 145; Def. Ex. 15). Dr. Godec also asked about the "marketing channel(s)" by which the physicians received information about Namenda from Forest, as well as the particular communications about Namenda they had received from Forest. (Godec Dep. at 205; Def. Ex. 15).

Dr. Godec provided the results of those interviews, which were in the form of handwritten notes, to attorneys at Milberg. (Godec Dep. at 45-46).

Physicians who provided "appropriate answers" to the interview questions were then invited to participate in a patient "chart review." (*Id.* at 221-23, 240).[6] Specifically, Dr. Godec solicited the charts of patients with mild Alzheimer's disease who had been treated with Namenda. (*Id.* at 224). Among other things, the written solicitation stated that "[f]or this study, we need a chart from a Medicare patient . . . ." (Def. Ex. 17).

Dr. Godec told the physicians that "patient information needed to be removed from the chart," or that "[e]ach chart must be prepared to protect the patient's identity (name, Social Security number, identifying information removed)." (Godec Dep. at 224, 242, 247). However, at least some physicians were explicitly told that it was "OK to leave date of birth" on the charts. (Def. Ex. 17, 18, 19). Physicians who agreed to provide patient charts were paid a $250

---

[5] Dr. Godec used the plural term "drugs" on multiple occasions, implying that drugs other than Namenda were part of the research study.

[6] A "chart review" is a review of a patient's medical records, typically for medical treatment or medical research purposes. (*See* Godec Dep. at 38).

"honorarium" for the first chart and a $150 "honorarium" for a second chart, if a second chart were requested. (Godec Dep. at 224, 240).

The patient charts were sent directly to Dr. Godec, who then reviewed them. (Godec Dep. at 65, 267). He then passed them on to attorneys at Milberg. (*Id*. at 45, 65-66, 267).[7] On occasion, he would ask a physician for additional chart information. (Def. Ex. 24).

At some point, attorneys at Milberg decided to conduct a second survey. (Godec Dep. at 110-12). The second survey focused more specifically on the off-label use of Namenda to treat mild Alzheimer's disease. (*Id*. at 173). That survey was also designed by attorneys at Milberg. (*Id*. at 179-80). The second survey was conducted between January and March 2014. (*Id*. at 33).[8]

Dr. Godec never told any of the physicians that the information they provided might be publicly disclosed. (*Id*. at 249, 268). Several—although not all— physicians were told that all of the information they provided would be kept "strictly confidential." (*Id.* at 245-46, 254). At least two, Dr. Yim H. Chan (a board-certified psychiatrist) and Mouhannad Azzouz (a board-certified neurologist), submitted affidavits stating that they never would have provided patient charts to Dr. Godec if they had known how the charts were going to be used. (Def. Exs. 25, 26).

Dr. Godec never told any of the physicians that he was working on behalf of a law firm. (Godec Dep. at 60, 204, 249-50). In his words, "we characterized this as a study to them." (*Id.* at 61-62). He specifically represented that he was "studying drugs to treat patients with dementia," and that it included drugs other than Namenda. (*Id.* at 64).

---

[7] At some point, Milberg attorneys apparently provided patient charts to representatives of the U.S. Attorney's Office and the Department of Justice.

[8] There was a third survey of physicians, conducted with a different vendor named Olson Research, in the period May to August 2015. (Godec Dep. at 92-94). Apparently, none of the information obtained from that survey was used in the preparation of the Second Amended Complaint. (*Id.* at 94).

Dr. Godec concealed the purpose of the study from the physicians in the hopes of eliciting "honest and truthful" answers about their experiences with Namenda. (*Id.* at 60, 271). Presumably, every physician who cooperated with Dr. Godec believed or understood that the purpose of the study was medical or scientific research.[9]

As noted, 36 physicians who provided information were named in the Second Amended Complaint, along with what purports to be a description of their prescribing practices (although at least some of the physicians deny that the information is accurate). Eight patients are identified in the same complaint, although not by name, with information (such as dates and amounts of prescriptions) that is clearly taken from their medical charts.

## II.    Analysis

### A.    Whether the Attorneys Violated the Rules of Professional Conduct

#### 1.    The Relevant Professional Rules

Subject to certain specific exceptions not relevant here, attorneys practicing in the District of Massachusetts must comply with the Massachusetts Rules of Professional Conduct as adopted by the Supreme Judicial Court. *See* LR, D. Mass. 83.6.1.[10] The Massachusetts Rules of Professional Conduct, which are modeled on the American Bar Association model rules, set forth the ethical requirements that must be followed by all lawyers practicing in the Commonwealth. *See generally* Mass. S.J.C. Rule 3:07. Lawyers may not avoid the rules by hiring others to perform prohibited acts, and are responsible for the wrongful acts of those that

---

[9] At least one physician that Dr. Godec had interviewed later sent him a fax stating, "I feel like I was misled in the questioning of the study." (Godec Dep. at 225; Def. Ex. 28). She also advised him that although she had used Namenda for mild Alzheimer's patients, it was not due to the promotional activities of Forest representatives. (*Id.*).

[10] Although Dr. Godec is licensed in Maryland and Virginia, and the attorneys at Milberg are licensed in New York, California, and other states, the conduct in question occurred in the course of litigating a case pending in the District of Massachusetts. The applicable ethical rules, at least as to whether there should be a case-related sanction, are those of the District of Massachusetts.

they knowingly assist or direct. See MASS. RULES OF PROF'L CONDUCT R. 8.4(a); *In re Crossen*, 450 Mass. 533, 566 (2008).

Two rules of professional conduct are at issue in this case. First, Rule 4.1(a) states that "[i]n the course of representing a client, a lawyer shall not knowingly . . . make a false statement of material fact or law to a third person." MASS. RULES OF PROF'L CONDUCT, S.J.C. Rule 3:07, Rule 4.1(a). Second, Rule 8.4(c) states that "[i]t is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." *Id.*, Rule 8.4(c). Because, in the context of this case, the two rules cover essentially the same ground, the Court will address the two rules together.

Although the rules on their face impose sweeping prohibitions, in fact they have been interpreted to contain narrowly defined exceptions that permit the gathering of evidence under certain circumstances. The first exception, not relevant here, permits prosecutors and other government attorneys to conduct undercover criminal investigations, which typically require some level of deception or misrepresentation. *See In re Crossen*, 450 Mass. 533, 567-68 (2008) (noting that prosecutors operate under "unique restraints and oversight" that do not apply to private attorneys).[11] The second exception permits civil attorneys to use investigators in certain circumstances to obtain information that would normally be available to any member of the public (such as a prospective renter or a consumer making a similar inquiry). For example, attorneys may use "testers"—individuals who pose as renters or purchasers with no intent to actually rent or purchase a home—in order to gather evidence of housing discrimination. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982). Similarly, in the context of

---

[11] *Crossen* involved the predecessor Massachusetts disciplinary rules, including DR 1-102(A)(4) ("A lawyer shall not . . . [en]gage in conduct involving dishonesty, fraud, deceit, or misrepresentation") and DR 7-102(A)(5) ("In his representation of a client, a lawyer shall not . . . k]nowingly make a false statement . . . fact").

trademark disputes, attorneys may retain undercover investigators to pose as ordinary customers in order to gather evidence of suspected infringement. *See Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 119, 120, 122 (S.D.N.Y. 1999).[12]

The Massachusetts Supreme Judicial Court has described the permissible practices as follows:

> "Testing" involves deception of a particular kind: investigators pose as members of the public interested in procuring housing or employment, in order to determine whether they are being treated differently based on their race or sex. Their aim is to reproduce an existing pattern of illegal conduct. Some private investigators whose aim is to uncover other civil wrongdoing, such as trademark infringement or breach of contract, similarly disguise their identity and purpose without running afoul of ethical rules.

*In re Curry*, 450 Mass. 503, 523 (2008); *see id.* at 524 (contrasting the scheme at issue in that case with an investigation intended merely to "note or reproduce" the witness's "usual behavior").

It is thus true that some degree of deception by attorneys, at least under some circumstances, is permissible in order to gather evidence for use in litigation. Such an investigative exception, however, is not set out in the rules themselves, but has been created by courts as a judicial gloss on those rules. Furthermore, and in any event, the SJC has made clear that any exceptions to the rules against deceit and misrepresentation by attorneys are limited in scope. *See Curry*, 450 Mass. at 524.

The related cases of *Crossen* and *Curry* provide the leading Massachusetts examples of

---

[12] *See also Apple Corps Ltd. v. International Collectors Soc.*, 15 F. Supp. 2d 456, 476 (D.N.J. 1998) ("'Investigators and testers, however, do not engage in misrepresentations of the grave character implied by the other words in the phrase [dishonesty, fraud, deceit], but, on the contrary, do no more than conceal their identity or purpose to the extent necessary to gather evidence.'") (quoting David Isbell & Lucantonio Salvi, *Ethical Responsibility of Lawyers for Deception by Undercover Investigators and Discrimination Testers: An Analysis of the Provisions Prohibiting Misrepresentation Under the Model Rules of Professional Conduct*, 8 Geo. J. Legal Ethics 791, 817 (1995) (alteration in original)).

the limitations of the investigative exception. In *Crossen*, an attorney was convinced that the judge presiding over a matter in which he represented some of the litigants was biased against his clients. 450 Mass. at 538. He hired investigators to pose as corporate executives and interview the judge's law clerk for a fictitious job in the hopes of eliciting damaging statements about the judge's decision-making processes. *Id.* at 540-41. When the interview, which was recorded, failed to produce the kind of evidence Crossen was hoping for, he threatened to release the recording of the interview—in which the investigator brought up the clerk's submission of a letter of support for his bar application written by an attorney who falsely claimed to know him—unless the clerk provided statements confirming the judge's bias. *Id.* at 548-49, 551, 561. The SJC concluded that such conduct bordered on extortion and clearly violated the ethical rules. *Id.* at 562, 568. *Curry* involved an attorney who participated in the same scheme (indeed, initiated it). 450 Mass. at 506-17.

Among the aspects of the conduct condemned by the SJC in *Crossen* and *Curry* were the fact that the attorneys were engaged in a complex scheme of deception, not a straightforward effort to gather evidence. *See Curry*, 450 Mass. at 524 (referring to conduct as an "elaborate fraudulent scheme," and noting that "[t]his coercive and deceptive process was designed to trick the law clerk, not to note or reproduce his usual behavior"); *Crossen*, 450 Mass. at 557 (referring to "baroque falsehoods" by the attorneys). The court was also deeply troubled by the fact that the conduct was highly intrusive: it was intended to obtain information concerning the confidential relationship between the judge and the law clerk, which in turn tended to harm the administration of justice. *See Curry*, 450 Mass. at 526 (expressing concern about the "efforts to pierce the confidential communications of a former law clerk and a judge in a pending matter"); *Crossen*, 450 Mass. at 559-60 & n.38 (same). And the court gave short shrift to the argument

that the scheme was merely an investigative technique that was necessary to obtain evidence that otherwise might be difficult to acquire. *See Curry*, 450 Mass. at 524-26 (observing that "Curry was not . . . a noble crusader seeking to root out judicial misconduct by engaging the law clerk in an interview that was a pretext"); *Crossen*, 450 Mass. at 565-66.

With that framework in mind, the Court turns to the conduct at issue here.

## 2. Whether the Conduct Involved False Statements or Deceit

There is no dispute that the investigative scheme devised by attorneys at Milberg, with the assistance of Dr. Godec, involved an elaborate series of falsehoods, misrepresentations, and deceptive conduct.

The investigation was designed to appear as if it were a medical research study; its only purpose, however, was to obtain otherwise-confidential information from busy medical professionals for use in litigation. To accomplish that end, Dr. Godec falsely stated, and repeatedly implied, that the study had a benign research purpose. Indeed, the survey invitation explicitly said so. (Hancock Decl. ¶ 4) ("The data collected will only be used for research purposes.").

Dr. Godec also falsely stated that the information obtained from the physicians would be kept confidential. The survey invitation stated: "As always, we value your privacy. All responses will be anonymous and aggregated." (*Id.* ¶ 4). Dr. Godec explicitly told several of the physicians that the information they provided would be kept strictly confidential. (Godec Dep. at 254). Those statements were, of course, entirely false. Indeed, the complaint lists the names and addresses of 36 physicians, as well as varying degrees of information about their treatment and prescription practices.

Those misrepresentations were also material. At least two of the physicians involved in

the "study" have submitted declarations stating that they would not have participated had they known that the information they provided was going to be used for purposes of litigation and disclosed in publicly filed court documents. (Chan Decl. ¶ 11; Azzouz Decl. ¶¶ 12-14).

Finally, there is no doubt that the entire scheme was devised by attorneys at Milberg and that Dr. Godec was simply acting as their agent.[13]

Because the scheme clearly involved false statements of material facts, and false conduct involving dishonesty, fraud, deceit, or misrepresentation, it therefore falls as a facial matter within the express prohibitions of Rules 4.1(a) and 8.4(c). The question then becomes whether the conduct of the attorneys is subject to any investigative exception to those rules.

### 3. Whether the Conduct Is Permissible for Investigative Purposes

As set forth above, notwithstanding the broad facial sweep of Rules 4.1(a) and 8.4(c), courts in Massachusetts and elsewhere have permitted attorneys to engage in certain limited types of deception for investigative purposes.[14] It is true that there is no bright line between permissible and impermissible conduct, and to some extent the question is one of degree. Nonetheless, for the reasons that follow, the Court concludes that the conduct of the attorneys far exceeded the boundaries of any investigative exception to the ethical rules.

### a. The Nature and Degree of the Deception

First, the scheme went well beyond a mere concealment of identity and purpose in order to obtain evidence. These were not inquiries to a prospective landlord, employer, or purchaser of

---

[13] Because relator has claimed that the communications between Dr. Godec and the attorneys are privileged or protected attorney work product, there is no information in the record as to the precise identity of the Milberg attorneys.

[14] As noted, the rules prohibit all forms of false statements, deceit, and misrepresentation, and the case law has grafted certain (unwritten) exceptions to those rules. *Cf. Curry*, 450 Mass. at 521 ("[The disciplinary rules] are not obscure. They harbor no implicit exception."). Such conduct is thus presumptively *improper*, unless a court has approved it (or would likely approve it); it is not presumptively *proper* unless a court has condemned it.

consumer products, seeking information that would be readily available to any member of the public who was seeking the products or services in question. While the use of discrimination testers or investigators under such circumstances generally has not been found to violate the ethical rules, no case cited by the relator is remotely analogous to the present circumstances. *Cf. Northside Realty Assoc., Inc. v. United States*, 605 F.2d 1348, 1355 (5th Cir. 1979) (holding that government testers did not violate Fourth Amendment because they "did no more than what any member of the home-buying public is invited, and indeed welcomed, to do. . . . [They did not] examine or take any confidential or private papers").

*Gidatex*, for example, involved a trademark infringement dispute between a furniture manufacturer and a retailer. An attorney hired private investigators to pose as interior decorators in order to determine whether the retailer was continuing to use the manufacturer's trademark after their licensing agreement had been terminated. 82 F. Supp. 2d at 120. The investigators observed the use of the trademark within the store, and recorded conversations in which salespeople told them, falsely, that the company did not exist any longer but that products from other manufacturers they carried would be of the same quality. *Id.* at 120-21. The court held that the conduct did not violate the Rules of Professional Conduct because the "[t]he presence of investigators posing as interior decorators did not cause the sales clerks to make any statements they otherwise would not have made." *Id.* at 122. Rather, the investigators were simply posing as "member[s] of the general public engaging in ordinary business transactions with the target [of the investigation]." *Id.*

Similarly, in *Apple Corps*, the plaintiff believed that the defendant was unlawfully selling stamps bearing plaintiff's trademarks and copyrighted photographs. 15 F. Supp. 2d at 458. Attorneys for the plaintiff, as well as their agents, called the defendant, without disclosing their

identities, in order to see if they could purchase the stamps at issue.  *Id.* at 462-64.  In holding

that the attorneys' conduct did not violate Rule 8.4(c), the court noted that keeping their

identities and purpose concealed was the only way they could determine the defendant's "day-to-

day practices in the ordinary course of business."  *Id.* at 475.  In other words, the attorneys

wanted to know whether the defendant would sell the stamps at issue to any ordinary customer,

and the only way to determine that was to pose as any ordinary customer.

The conduct at issue in this case is of a significantly different degree and kind.  It was an

elaborate scheme, involving a fake medical research study, intended to elicit information from

practicing physicians about patients under their care.  Dr. Godec did not simply pose as an

ordinary member of the public in order to elicit the same responses that the physicians would

have given to any other member of the public.  As the attorneys were no doubt aware, physicians

are generally prohibited from disclosing patient information to members of the general public,

and are not likely to do so even if the information is rendered anonymous or otherwise does not

technically violate any privilege or privacy rule.  *See Alberts v. Devine*, 395 Mass. 59, 66 (1985)

("[T]he confidentiality of the [doctor-patient] relationship is a cardinal rule of the medical

profession, faithfully adhered to in most instances, and thus has come to be justifiably relied

upon by patients seeking advice and treatment." (internal quotation marks omitted)).

Dr. Godec thus posed as the only kind of person in the only kind of circumstances under

which a physician would likely disclose patient information—another physician conducting

legitimate medical research.  No one posing as an ordinary consumer (or patient or salesperson)

would have been able to elicit the same type of information.  In short, the scheme at issue here is

much more like the elaborate deception condemned in *Crossen* and *Curry* than the mild

dissembling of the housing discrimination tester approved in *Havens*, the purchaser of

trademarked goods approved in *Gidatex*, or the purchaser of stamps approved in *Apple Corps*. *See Curry*, 450 Mass. at 523 ("Curry's scheme is different from such investigations not only in degree but in kind . . . .").

**b.      The Nature of the Targeted Information**

The scheme here was also highly intrusive; in fact, it was intended to intrude into one of the most sensitive and private spheres of human conduct, the physician-patient relationship. The confidentiality of that relationship is subject to a panoply of protections under federal and state law and medical ethical rules. The scheme was intended to strike at the heart of that relationship, and to induce physicians to reveal private medical information concerning their patients.

The importance of protecting the confidentiality of patient medical information is so obvious that it is only necessary to touch on some of the more basic sources of that protection. Among other things, the Principles of Medical Ethics forbid the disclosure of confidential patient information without the patient's consent. *See Sugarman v, Board of Registration in Med.*, 422 Mass. 338, 344 (1996). The federal Health Insurance Portability and Accountability Act ("HIPPA"), 42 U.S.C. § 1320d-6(a), prohibits the disclosure of "individually identifiable health information" without authorization (although the proscriptions on disclosing such information are somewhat relaxed in the context of legitimate research studies, *see* 45 C.F.R. § 164.508(b)(3)(i), (c)(1)(v)). The Massachusetts privacy statute, Mass. Gen. Laws ch. 214, § 1B, grants patients a privacy interest in the confidentiality of their medical information. *See, e.g., Tower v. Hirschhorn*, 397 Mass. 581, 586-88 (1986) (holding that doctor's discussion of plaintiff's condition and treatment violates Massachusetts privacy statute). Furthermore, the widely recognized physician-patient privilege is premised on the confidentiality of communications made between patients and their physicians. *See In re Grand Jury Investigation*

*in N.Y. Cnty.*, 779 N.E.2d 173, 175 (N.Y. 2002) (recognizing that the physician-patient privilege "protects patients' reasonable privacy expectations against disclosure of sensitive personal information").

All of this was surely known to the Milberg attorneys at the time they made the decision to engage Dr. Godec and to devise the scheme. *See Crossen*, 450 Mass. at 559 ("We have no doubt that . . . Crossen, an experienced attorney, knew that the communications about deliberative processes that flow between judge and law clerk were confidential and an important aspect of the administration of justice."). Nonetheless, they devised a fake "research study" that was specifically intended to, and did, target confidential patient information.

It is no answer to say that the Milberg attorneys made some attempts to design the "study" to protect patient privacy. The attorneys were undoubtedly aware that physicians would be much less cautious about sharing confidential patient information with someone who was a licensed physician, who was himself subject to medical ethical rules and other restraints, who represented that he was conducting legitimate medical research, and who promised to maintain patient confidentiality and anonymity. Furthermore, Milberg's efforts were sloppy at best; for example, at least some physicians were told that it was permissible to leave birthdate information on the charts, which was clearly "protected health information" under HIPPA. (Def. Ex. 17).[15]

---

[15] The term "protected health information" under HIPPA means "individually identifiable health information." 45 C.F.R. § 160.103. "Individually identifiable health information" means:

> [A]ny information, including demographic information collected from an individual that—
>
> (A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and
>
> (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and—
>
>     (i) identifies the individual; or

But the Milberg attorneys not only caused physicians to disclose patient information, they then *published* that information in the Second Amended Complaint.  For example, the complaint includes the name and complete address of Patient A's physician; her height, weight, sex, and age; the dates of her treatment; the complete address of the pharmacy she uses; her diagnosis; and her treatment history.  (2d Am. Compl. ¶¶ 89, 94-95).  There is no question that the information was created by a healthcare provider and that it relates to the physical or mental health of an individual.  It is also information from which it is reasonably possible for at least some persons to identify the individual.

That is not merely a hypothetical possibility.  Patient A appears to be a resident of Long Beach, California, a populous suburb of Los Angeles, and therefore enjoys some relative degree of anonymity as a result.  Other patients, however, are much more readily identifiable.  For example, Patient E is being treated by a physician, and apparently resides, in Abbeville, Alabama.  (2d Am. Compl. ¶ 123).  Abbeville had a population of 2,688 as of the 2010 census. (United States Census Bureau, *Community Facts*, AMERICAN FACTFINDER, https://factfinder. census.gov/faces/nav/jsf/pages/community_facts.xhtml (last visited April 27, 2017)).  Because the Second Amended Complaint discloses Patient E's gender, height, weight, and age; the name and address of her treating physician; her medical diagnosis; the dates of her treatment; and her prescription history, her privacy in that small town is preserved, if at all, by only the thinnest of veils.  The same can be said of Patient G, who was treated in Robbins, North Carolina, population 1,097.  (Compl. ¶ 140; United States Census Bureau, *Community Facts*, AMERICAN

---

(ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d(6).  For health information to be rendered non-identifiable, the following information, among other things, must be removed:  names; all geographic subdivisions smaller than a state; and dates (except for years) for dates directly related to an individual, including birth date and admission date.  45 C.F.R. § 164.514(b)(2)(i).

FACTFINDER, https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml (last visited April 27, 2017)).

In short, the scheme at issue here was intended to, and did, intrude into the most private affairs of innocent patients, and resulted in the publication of sensitive medical details of those persons. Again, such a scheme is far closer to the conduct condemned in *Curry* and *Crossen* than the types of limited investigative misrepresentation that have been approved by the courts.

### c. The Nature of the Targeted Persons

It is also noteworthy that the targets of the deceptive conduct were not the suspected wrongdoers (that is, the representatives of Forest who allegedly engaged in illegal or improper conduct). The targets were wholly innocent physicians who are neither accused nor suspected of participating in the alleged scheme. It is a fair inference that the physicians in question were busy professionals who must carefully weigh the value of any intrusion on their scarce time. Here, they did so on the (incorrect) assumption that it might help improve the treatment of patients with Alzheimer's. (*See* Azzouz Decl. ¶¶ 12-14). At a minimum, such conduct breeds distrust and skepticism, particularly among physicians. Such skepticism could deter physicians from participating in the true medical research necessary to improve patient treatment.

### d. Whether the Deception is Justifiable Due to Necessity

To the extent that ethical rules tolerate *any* level of misrepresentation or deceit as to identity and purpose, it is justified on the ground that such conduct is sometimes necessary in order to collect evidence of wrongdoing. *See Apple Corps*, 15 F. Supp. 2d. at 475 ("The prevailing understanding in the legal profession is that a public or private lawyer's use of an undercover investigator to detect ongoing violations of the law is not ethically proscribed, especially where it would be difficult to discover the violations by other means."). This is

particularly true in the discrimination context, where evidence is often very difficult to gather. *See Richardson v. Howard*, 712 F.2d 319, 321 (7th Cir. 1983) (noting that evidence produced by testers is "valuable, if not indispensable" and that deception is a "relatively small price to pay to defeat racial discrimination"). Relator contends that, particularly given the heightened pleading requirements of Rule 9(b), specific instances of fraud would be difficult, if not impossible, to allege without the kind of misrepresentations used here.

That argument is unpersuasive. Relator brought this action under the *qui tam* provisions of the FCA 31 U.S.C. § 3730(b). The FCA's *qui tam* provisions balance two competing policies: "On the one hand, the *qui tam* provisions seek to encourage whistleblowers to act as private attorneys-general in bringing suits for the common good. On the other, the provisions seek to discourage opportunistic plaintiffs from bringing parasitic lawsuits whereby would-be relators merely feed off a previous disclosure of fraud." *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005) (internal quotation marks and citations omitted). To that end, the FCA precludes jurisdiction over suits where allegations of fraud are based on publicly disclosed information, unless the relator was the "original source" of the information. *See United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 681 (1st Cir. 1997). "The paradigmatic 'original source' is a whistleblowing insider. . . . [those] 'individuals who are close observers or otherwise involved in the fraudulent activity.'" *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1161 (3d Cir. 1991) (quoting S. Rep. No. 345, at 4).

The FCA thus specifically envisions relators filing suit based on their own personal knowledge. Surely many whistleblowing insiders can—and do—plead facts with sufficient factual specificity to satisfy Rule 9(b) without having to conduct undercover investigations of

physician-patient relationships. Such investigations are, therefore, not an essential component of a *qui tam* action, and are unnecessary when the relator actually has personal knowledge of wrongdoing.

Of course, that is not to say that relators cannot supplement their knowledge with investigations, rather than rely entirely on direct, first-hand knowledge. *See Stinson, Lyons, Gerlin & Bustamante*, 944 F.2d at 1161 (noting that "[o]ther relators may also qualify if their information results from their own investigations"). However, the fact that relators *may* proceed on the basis of information received through investigation does not mean that they must do so, or that doing so is the only way they will be able to bring an action. And it is certainly no reason to relax the attorney ethical rules prohibiting false statements and fraud.[16]

**e.**      **Conclusion**

In summary, the Milberg attorneys devised and implemented an elaborate scheme of misrepresentation and deceit under the guise of a legitimate medical research study. The scheme was intended to—and did—intrude on the physician-patient relationship and induce physicians to disclose confidential patient information, without legal justification. Under the circumstances, the Court has little difficulty concluding that the conduct of the attorneys in this case violated Rules 4.1(a) and 8.4(c) of the Massachusetts Rules of Professional Conduct, and therefore violated Local Rule 83.6.1 of the United States District Court.

**B.**      **Sanctions**

The question then becomes whether and how this Court ought to impose a sanction for

---

[16] The Milberg attorneys also attempt to justify their conduct on the ground that the complaints were filed under seal, and they were therefore forbidden from disclosing to the physicians that they were attorneys representing a *qui tam* plaintiff. That argument requires little by way of response. While it is true that the original complaint (and First Amended Complaint) were filed under seal, nothing prevented the attorneys from identifying themselves as attorneys, or advising the physicians that they were gathering evidence in connection with prospective litigation.

the misconduct of the attorneys. This is not, of course, a disciplinary proceeding against the individual attorneys involved, and individual sanctions against those attorneys are therefore not appropriate in this proceeding. However, the information obtained by means of the unethical conduct formed the core of relator's Second Amended Complaint. That information, and in particular the detailed treatment histories of the eight patients profiled in paragraphs 89 through 156, also directly resulted in this Court's denial of Forest's earlier motion to dismiss. *See Leysock*, 55 F. Supp. 3d at 218-19.[17]

Furthermore, it appears that Dr. Godec's study was conducted solely for the purpose of ensuring that the complaint survived a motion to dismiss, and that the attorneys intended to discard the information gleaned from the study if and when it could be replaced by evidence disclosed during discovery. Indeed, when Forest sought to compel the disclosure of information relating to the study, relator opposed that motion in part on the basis that he had "no intention whatsoever of introducing any of the documents sought into evidence, or otherwise using them in support of his claims." (Pl. Mem. in Opp. to Def. Mot. to Compel at 15).

For purposes of determining the remedy, an analogy may be drawn to *Franks v. Delaware*, 438 U.S. 154 (1978). There, the Supreme Court held that when there is sufficient evidence that an affidavit supporting a search warrant contained deliberate falsehoods or was created in reckless disregard for the truth, the portions of that affidavit containing the false or

---

[17] Claims brought under the FCA fall within the heightened pleading requirement of Fed. R. Civ. P. 9(b). *See United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 45 (1st Cir. 2009). Under Rule 9(b), parties alleging fraud "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Thus, in the FCA context, a complaint must "specify 'the time, place, and content of an alleged false representation.'" *Gagne*, 565 F.3d at 45 (quoting *United States ex rel. Rost v Pfizer, Inc.*, 507 F.3d 720, 731 (1st Cir. 2007)). That heightened pleading requirement is intended to "give notice to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant information during discovery." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996); *see also United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 231 (1st Cir. 2004) (holding that a *qui tam* relator "may not present general allegations in lieu of the details of actual false claims in the hope that such details will emerge through subsequent discovery").

reckless statements should be set aside. *Id.* at 171-72. If, however, "there remains sufficient content in the warrant affidavit to support a finding of probable cause," then no hearing is required and the warrant and all information gathered from the resulting search will stand. *Id.* at 172. In other words, if probable cause for the search warrant would have existed even without the false or reckless statements, then those statements were, for all practical purposes, irrelevant.

Such an approach is within the court's power to impose. A federal court has certain implied powers "'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 66, 630-31 (1962)); *see also United States v. Kouri-Perez*, 187 F.3d 1, 7 (1st Cir. 1999) (recognizing that courts are imbued with inherent powers in performing case management function). Pursuant to that power, courts may, for example, discipline attorneys who appear before it or dismiss cases in their entirety as a sanction for conduct that abuses the judicial process. *Chambers,* 501 U.S. at 44-45. However, courts' "inherent powers must be exercised with restraint and discretion." *Id.* at 44. Courts should normally deploy "the least extreme sanction reasonably calculated to achieve the appropriate punitive and deterrent purposes." *Kouri-Perez*, 187 F.3d at 8.

To be sure, whatever sanction is imposed must be sufficient to prohibit the use of evidence obtained unethically and deter others from engaging in such behavior in the future. However, that consideration must also be balanced against the purposes of the FCA and broader interests in pursuing valid allegations of false claims against the government.

That balance can be best achieved by applying a *Franks*-type remedy: that is, by removing from the complaint all information derived by means of the unethical investigation. If what remains is sufficient to pass muster under Rule 9(b), then the case may proceed. However,

if what remains is insufficient—if, in other words, the case survived the motion to dismiss only because of the improperly obtained information—then the case will be dismissed.

Here, what survives after removing the improperly obtained information is clearly insufficient for the complaint to survive under Rule 9(b). In order to satisfy Rule 9(b) in the FCA context, the First Circuit has stated that:

> [A] relator must provide details that identify particular false claims for payment that were submitted to the government. In a case such as this, details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices are they types of information that may help a relator to state his or her claims with particularity. These details do not constitute a checklist of mandatory requirements that must be satisfied by each allegation included in a complaint. However, . . . we believe that some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b).

*United States ex rel. Ge v. Takeda Pharm. Co.*, 737 F.3d 116, 123 (1st Cir. 2013) (quoting *Karvelas*, 360 F.3d at 232-33) (alterations original) (internal quotation marks omitted). However, in a *qui tam* action "in which the defendant is alleged to have induced third parties to file false claims with the government, a relator can satisfy this requirement by 'providing factual or statistical evidence to strengthen the inference of fraud beyond possibility without necessarily providing details as to each false claim.'" *Id.* at 123-24 (quoting *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 29 (1st Cir. 2009)).

The modified Second Amended Complaint includes detailed allegations that Forest sales representatives marketed Namenda to treat mild Alzheimer's disease. (Compl. ¶¶ 41-85). However, the only allegations that prescriptions for patients with mild Alzheimer's were billed to Medicare were derived from Dr. Godec's study. For example, the complaint alleged in great detail eight Medicare patients who were prescribed Namenda for mild Alzheimer's in reliance on

Forest's promotion. (*See id.* at ¶¶ 97, 107, 115, 122, 130, 139, 148, 156). The complaint also alleges that 28 other physicians had Medicare patients, had patients with mild Alzheimer's, prescribed Namenda for mild Alzheimer's, and did so in reliance on information received from Forest. (2d Am. Compl. ¶ 185). The complaint further alleges that, in a nationwide survey of physicians who accept Medicare patients and regularly treat patients with mild Alzheimer's, 60% of physicians reported writing off-label prescriptions for Namenda in reliance on Forest's off-label promotion. (2d Am. Compl. ¶¶ 203-04).

All of that information also appears to have been derived from Dr. Godec's study, including his chart reviews. (Pl. Mem. Opp. at 5). If that information is struck—that is, if the specific factual allegations derived from Dr. Godec's study are eliminated—the Second Amended Complaint fails to plead the filing of false claims with the specificity required by Rule 9(b). Because those allegations will be struck as a sanction for attorney misconduct, dismissal of the Second Amended Complaint is required.

## III.  <u>Conclusion</u>

For the foregoing reasons, the allegations of the Second Amended Complaint at paragraphs 86 through 202 are hereby STRUCK as a sanction for violations of Local Rule 83.6.1 of the District of Massachusetts. The remaining allegations of the Second Amended Complaint do not plead fraud or misrepresentation with sufficient particularity to satisfy the requirements of Fed. R. Civ. P. 9(b). Accordingly, the motion of defendants Forest Laboratories, Inc., and Forest Pharmaceuticals, Inc., to dismiss is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV

Dated:  April 28, 2017                   United States District Judge